**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **DEEP MARINE HOLDINGS, INC.,** | § | **Case No. 09-39313** |
| **et al.** | § | |
| | § | **Jointly Administered** |
| Debtors. | § | **Chapter 11** |

| | | |
|---|---|---|
| **THE DEEP MARINE LIQUIDATING** | § | |
| **TRUST (AS SUCCESSOR TO DEEP** | § | |
| **MARINE 3, LLC)** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **Adversary No. 10-_____** |
| **THE DEEP MARINE LIQUIDATING** | § | |
| **TRUST (AS SUCCESSOR TO DEEP** | § | |
| **MARINE HOLDINGS, INC., DEEP** | § | |
| **MARINE TECHNOLOGY** | § | |
| **INCORPORATED, DEEP MARINE 1,** | § | |
| **LLC, DEEP MARINE 2, LLC, AND DEEP** | § | |
| **MARINE 4, LLC); GREENWOOD** | § | |
| **MARINE MANAGEMENT, INC.; BNA** | § | |
| **MARINE SERVICES, INC.; OTTO** | § | |
| **CANDIES, LLC; ARAMARK US** | § | |
| **OFFSHORE SERVICES, LLC; CONRAD** | § | |
| **SHIPYARD, LLC; B&J MARTIN, INC.;** | § | |
| **THE IUC GROUP, INSPECTRONIC** | § | |
| **CORPORATION; CAPROCK** | § | |
| **COMMUNICATIONS, INC; DCC** | § | |
| **VENTURES, LLC; AND DOERLE FOOD** | § | |
| **SERVICES LLC** | § | |
| | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT (I) TO INTERPLEAD FUNDS AND (II) TO**
**DETERMINE EXTENT, VALIDITY, AND PRIORITY OF**
<u>**CLAIMS TO PROCEEDS OF THE DMT TOPAZ**</u>

Plaintiff, the Deep Marine Liquidating Trust (as successor to Deep Marine 3, LLC ("DM3")), files this Original Complaint (i) to Interplead Funds, and (ii) to Determine Extent, Validity, and Priority of Claims to Proceeds of the DMT Topaz (the "Complaint") against the Deep Marine Liquidating Trust (as successor to Deep Marine Holdings, Inc., Deep Marine Technology Incorporated ("DMT"), Deep Marine 1, LLC, Deep Marine 2, LLC, and Deep Marine 4, LLC); Greenwood Marine Management, Inc.; BNA Marine Services, LLC; Otto Candies, LLC; Aramark US Offshore Services, LLC; Conrad Shipyard, LLC; B&J Martin, Inc.; The IUC Group, Inspectronic Corporation; CapRock Communications, Inc.; DCC Ventures, LLC; and Doerle Food Services LLC (together, the "Defendants") as follows:

## I. PARTIES

1.     DM3 is a debtor in the above captioned jointly administered bankruptcy case by virtue of having filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on December 4, 2009.  The Deep Marine Liquidating Trust (the "Liquidating Trust") succeeded to DM3's interests on July 9, 2010 (the "Effective Date").

2.     The Defendants allege secured claims, unsecured claims or surcharge claims against the proceeds of the sale of the DMT Topaz and Related Equipment[1] (the "Topaz Proceeds"), and can be served as follows:

(a)     Defendant the Deep Marine Liquidating Trust ("Liquidating Trust") may be served with process by serving John Bittner, Liquidating Trustee, 1717 Main Street, Suite 1500, Dallas, TX 75201.

---

[1] "Related Equipment" shall be given the precise meaning ascribed to it in the purchase and sale agreement attached hereto as Exhibit A.

(b)     Defendant Greenwood Marine Management, Inc. may be served with process by serving its registered agent, Andrew Reed, 1304 Victor II Boulevard, Morgan City, LA 70380.

(c)     Defendant BNA Marine Services, LLC may be served with process by serving its president and registered agent, Jacob J. Breaux, 1101 Hickory St., Morgan City, LA 70380.

(d)     Defendant Otto Candies, LLC may be served with process by serving its manager and registered agent, Paul B. Candies, 17271 Hwy. 90, Des Allemands, LA 70030.

(e)     Defendant Aramark U.S. Offshore Services, LLC may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE, 19801.

(f)     Defendant Conrad Shipyard, LLC may be served with process by serving its manager and registered agent, John P. Conrad, Jr., 1501 Front St., Morgan City, LA.

(g)     Defendant B&J Martin, Inc. may be served with process by serving its president and registered agent, Gail M. Martin, 18104 West Main St., Galliano, LA 70354.

(h)     Defendant The IUC Group, Inspectronic Corporation may be served with process by serving its president, Lionel Galerne, 222 Fordham St., City Island, NY 10464.

(i)     Defendant CapRock Communications, Inc. may be served with process by serving its vice president and general counsel, Alan Aronowitz, 4400 S. Sam Houston Parkway E., Houston, TX 77048.

(j)     Defendant DCC Ventures, LLC may be served with process by serving its registered agent, National Registered Agents, Inc. of NV, 1000 East William Street, Suite 204, Carson City, NV 89701.

(k)     Defendant Doerle Food Services, LLC may be served with process by serving its registered agent, Robert G. Jackson, Jackson & Jackson, PLLC, 111 Founders Dr., Suite 400, Baton Rouge, LA 70810.

## II.  JURISDICTION AND VENUE

3.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334 because this is a proceeding arising in or related to a case under the Bankruptcy Code.  Pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7008(a), the Liquidating Trust states that this is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (C), (K), and (O).  Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because the chapter 11 cases this proceeding relates to are pending in this district.

## III.  RELEVANT BACKGROUND FACTS

4.     On December 4, 2009 (the "Petition Date"), Deep Marine Holdings, Inc. and certain of its affiliates (together, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

5.     On March 15, 2010, the Debtors filed their Joint Plan of Reorganization (doc. no. 295) (as modified and amended, the "Plan").

6.     Also on March 15, 2010, the Debtors filed their Motion for (a) Entry of an Order (i) Approving Bidding Procedures, (ii) Scheduling Bidding Deadline, Auction Date and Sale Hearing Date, (iii) Approving Form and Notice Thereof, and (b) Entry of an Order After the Sale Hearing (i) Authorizing the Debtors to Sell Their Assets, (ii) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases and (iii) Granting Related Relief (the "Sale Motion") (doc. no. 296).

7.     On March 30, 2010, the Debtors filed their Joint Disclosure Statement for the Debtors' Proposed Joint Plan of Reorganization (the "Disclosure Statement") (doc. no. 339), as well as their Motion for Entry of an Order (i) Approving Disclosure Statement, (ii) Determining Dates, Procedures, and Forms Applicable to Solicitation Process, (iii) Establishing Vote Tabulation Procedures, and (iv) Establishing Objection Deadline and Scheduling Hearing to Consider Confirmation of Plan (the "Solicitation Procedures Motion") (doc. no. 342).

8.     On April 12, 2010, the Court entered its Order Approving Debtor's Motion for Entry of an Order (i) Approving Bidding Procedures, (ii) Scheduling Bidding Deadline, Auction Date, and Sale Hearing Date, and (iii) Approving Form and Notice Thereof (the "Bid Procedures Order") (doc. no. 363).  Pursuant to the Bid Procedures Order, the Debtors published notice of the entry of the Bid Procedures Order, Auction (defined below) and Sale Hearing in the national edition of the Wall Street Journal.

9.     On April 29, 2010, the Court entered its order approving the Disclosure Statement as well as the solicitation procedures set forth in the Solicitation Procedures Motion (the "Solicitation Procedures Order") (doc. no. 421).

10.     The Debtors conducted an auction (the "Auction") on May 17, 2010, in accordance with the Bid Procedures Order.  At the Auction, Ezram, LLC ("Ezram") offered what the Debtors, in consultation with the Official Unsecured Creditors Committee (the "Committee"), determined to be the highest and best bid for the purchase and sale of one of the Debtor's vessels, the DMT Topaz.  Ezram agreed to pay a total of $6,200,000.00 (six million two hundred thousand USD) for the DMT Topaz and Related Equipment, as evidenced by the purchase and sale agreement dated June 1, 2010 and attached hereto as **Exhibit A**.

11.     On June 2, 2010, the Court conducted a hearing to consider the sale of substantially all of the Debtors' assets (the "Sale Hearing"), including the proposed sale of the DMT Topaz and the Related Equipment to Ezram free and clear of all Interests or Claims (the "Topaz Sale").  Also on June 2, 2010, the Court entered its Order Confirming Debtors' Joint Plan of Reorganization and Approving Sale of Substantially All Assets (the "Confirmation Order") (doc. no. 516), thereby approving the Topaz Sale.

12.     The Defendants have filed secured proofs of claim alleging a maritime and or other lien against the DMT Topaz by filing a claim against the estate of DM3 (Case No. 09-39317) as follows:

(a)     Greenwood Marine Management, Inc. has filed a $88,053.91 secured claim (claim no. 1) against the DMT Topaz.

(b)     BNA Marine Services, LLC has filed a $96,900.92 secured claim (claim no. 2) against the DMT Topaz.

(c)     Otto Candies, LLC has filed a $4,132,821.47 secured claim against the DMT Topaz (claim no. 3) based on seaman's wages allegedly paid by Otto Candies, LLC.

(d)     Otto Candies, LLC has also filed a $1,603,003.39 secured claim (claim no. 4) against the DMT Topaz based on an alleged secured promissory note for which it is claimed that the DMT Topaz served as collateral.

(e)     Aramark US Offshore Services, LLC has filed a $97,192.50 unsecured claim (claim no. 5) against the DMT Topaz.[2]

(f)     Conrad Shipyard, LLC has filed a $302,256.60 secured claim (claim no. 6) against the DMT Topaz.

---

[2] Although Aramark U.S. Offshore Services, LLC filed only an unsecured proof of claim against the estate of DM3, Aramark has filed a Notice of Perfection of 11 U.S.C. § 546(b) Interests in Deep Marine 3, LLC Property of the Estate in jointly administered case number 09-39313 (doc. no. 617).

(g)     B&J Martin, Inc. has filed a $79,652.56 secured claim (claim no. 7) against the DMT Topaz.

(h)     The IUC Group, Inspectronic Corporation has filed a $1,298,478.45 secured claim (claim no. 8) against the DMT Topaz.

(i)     CapRock Communications, Inc. has filed a $139,883.27 secured claim (claim no. 9) against the DMT Topaz.

(j)     DCC Ventures, LLC has filed a $2,526,371.94 secured claim (claim no. 10) against the DMT Topaz based on an alleged secured promissory note for which the DMT Topaz served as collateral.

(k)     Doerle Food Services, LLC has filed a $6,309.39 secured claim (claim no. 11) against the DMT Topaz.

(l)     In addition, the Liquidating Trust is asserting surcharge claims under 11 U.S.C. § 506(c) against the DMT Topaz which have yet to be resolved, but are likely to be in excess of $1 million.[3]

## IV.  COUNT ONE: INTERPLEADER

13.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

14.     The Topaz Proceeds are subject to competing creditor claims as more fully described above.  DM3 has received conflicting demands for the Topaz Proceeds and is uncertain as to the person or persons who are legally entitled to such proceeds.  Accordingly, the Liquidating Trust (as successor to DM3) seeks to interplead the Topaz Proceeds into the registry

---

[3] The Liquidating Trust has filed a Motion to Surcharge Proceeds of the M/V DMT Topaz (see doc. no. 591 in jointly administered case number 09-39313) which provides a specific statement of necessary and reasonable costs, fees, and expenses related to the preservation and disposition of the DMT Topaz.  The Liquidating Trust will seek to consolidate that contested matter with this adversary proceeding.

of the Court in order to streamline the legal proceedings necessary to determine how and to whom those funds should be distributed.

## V.  COUNT TWO: DETERMINE EXTENT, VALIDITY, AND PRIORITY OF CLAIMS TO PROCEEDS OF THE SALE OF THE DMT TOPAZ

15.     To the extent necessary or appropriate, the foregoing paragraphs are incorporated herein.

16.     As stated above, the Topaz Proceeds are subject to various competing claims. The Liquidating Trust has not determined the extent, validity and priority of the competing claims to the Topaz Proceeds.   Accordingly, the Liquidating Trust requests that the Court determine the extent, validity and priority of the claims asserted against the Topaz by the Defendants in this adversary proceeding as provided by Bankruptcy Rule 7001(2).

## VI.  REQUESTED RELIEF

17.     In accordance with the pleadings set forth herein, the Liquidating Trust requests:

(a)     that the Court allow the Liquidating Trust to interplead the Topaz Proceeds into the registry of the Court;

(b)     that the Court determine the extent, validity, and priority of the claims alleged by the Defendants against the DMT Topaz; and

(c)     that the Court award any other legal or equitable relief to the Liquidating

Trust as may be appropriate under the circumstances.

Respectfully submitted,

**BRACEWELL & GIULIANI LLP**

By:  _/s/ William A. Wood III_
        William A. (Trey) Wood III
        Texas Bar No. 21916050
        Trey.Wood@bgllp.com
        Marcy E. Kurtz
        Texas Bar No. 11768600
        Marcy.Kurtz@bgllp.com
        Jason G. Cohen
        Texas Bar No. 24050435
        Jason.Cohen@bgllp.com
        711 Louisiana, Suite 2300
        Houston, Texas 77002
        Telephone:     (713) 223-2300
        Facsimile:     (713) 221-1212

**ATTORNEYS FOR THE DEEP MARINE
LIQUIDATING TRUST**

# EXHIBIT A

**PURCHASE AND SALE AGREEMENT**

**DATED AS OF JUNE 1, 2010**

**BY AND AMONG**

**DEEP MARINE TECHNOLOGY INCORPORATED,
DEEP MARINE 3, LLC**

**AND**

**EZRAM LLC**

# TABLE OF CONTENTS

**Page**

ARTICLE 1     DEFINITIONS ................................................................................ 2

    Section 1.1.     Defined Terms ....................................................... 2
    Section 1.2.     Construction .......................................................... 4

ARTICLE 2     PURCHASE AND SALE OF ASSETS; CONDITIONS; DEPOSIT ........ 5

    Section 2.1.     Bankruptcy Court Approval ................................... 5
    Section 2.2.     Acquired Assets ..................................................... 5
    Section 2.3.     Closing Conditions ................................................ 6
    Section 2.4.     Deposit. .................................................................. 6

ARTICLE 3     THE CLOSING ............................................................................ 7

    Section 3.1.     Closing .................................................................. 7
    Section 3.2.     Deliveries Prior to the Closing .............................. 7
    Section 3.3.     Deliveries at Closing ............................................. 7
    Section 3.4.     Delivery of Vessel, ROVs, Other Equipment and Documentation ........... 7
    Section 3.5.     Taxes ..................................................................... 8

ARTICLE 4     REPRESENTATIONS AND WARRANTIES OF THE SELLERS .......... 9

    Section 4.1.     Organization; Good Standing; Qualification ......... 9
    Section 4.2.     Authority of the Sellers; Binding Effect ............... 9
    Section 4.3.     Ownership of Vessel and ROV ............................ 10
    Section 4.4.     Consents and Approvals ....................................... 10
    Section 4.5.     Brokers ................................................................. 10
    Section 4.6.     Coastwise Qualification ....................................... 10

ARTICLE 5     REPRESENTATIONS AND WARRANTIES OF BUYER .................... 10
    Section 5.1.     Organization; Good Standing; Qualification .......... 10

    Section 5.2.     Authority of Buyer; Binding Effect ...................... 10
    Section 5.3.     Consents and Approvals ....................................... 11
    Section 5.4.     Financing .............................................................. 11
    Section 5.5.     Brokers ................................................................. 11

ARTICLE 6     [INTENTIONALLY DELETED] ................................................. 11
ARTICLE 7     [INTENTIONALLY DELETED] ................................................. 11
ARTICLE 8     SURVIVAL OF REPRESENTATIONS AND WARRANTIES;
                DISCLAIMER .......................................................................... 11

    Section 8.1.     Survival of Representations and Warranties ........... 11
    Section 8.2.     Disclaimer ............................................................ 12

ARTICLE 9     TERMINATION ........................................................................ 13

    Section 9.1.     Termination by Buyer .......................................... 13
    Section 9.2.     Termination by the Sellers ................................... 13

ARTICLE 10     MISCELLANEOUS .................................................................. 13

NO:0025333/00001:141261v1

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| Section 10.1. | Waiver of Consequential Damages | 13 |
| Section 10.2. | Waiver of Right to Trial by Jury | 14 |
| Section 10.3. | Notices | 14 |
| Section 10.4. | Amendment; Waiver | 15 |
| Section 10.5. | Closing Date | 15 |
| Section 10.6. | Severability | 15 |
| Section 10.7. | Headings | 16 |
| Section 10.8. | Payment of Fees and Expenses | 16 |
| Section 10.9. | Assignments | 16 |
| Section 10.10. | Binding Effect; No Third-Party Beneficiary | 16 |
| Section 10.11. | Governing Law | 16 |
| Section 10.12. | Construction | 16 |
| Section 10.13. | Counterparts | 16 |
| Section 10.14. | Jurisdiction and Consent to Service | 16 |
| Section 10.15. | Attorneys' Fees | 17 |

EXHIBITS

Exhibit A-1    Other Equipment

Exhibit A-2    Related Equipment

Exhibit B    Items to Be Delivered by Sellers at Closing

NO:0025333/00001:141261v1

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement") is made and entered into as of June 1, 2010, by and among EZRAM LLC, a Texas limited liability company ("Buyer"), Deep Marine Technology Incorporated, a Texas corporation ("Technology"), and Deep Marine 3, LLC ("DM3" and, together with Technology, the "Sellers").

## RECITALS

WHEREAS, on December 4, 2009, the Sellers filed voluntary petitions seeking relief under the provisions of chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), and the Sellers' cases are being jointly administered as Case No. 09-39313 (the "Bankruptcy Case");

WHEREAS, on April 12, 2010, the Bankruptcy Court entered an Order (the "Bid Procedures Order") Approving Debtor's Motion for Entry of an Order (I) Approving Bidding Procedures (the "Bidding Procedures"), (II) Scheduling Bidding Deadline, Auction Date and Sale Hearing Date, and (III) Approving Form and Notice Thereof;

WHEREAS, the Buyer submitted a Qualifying Bid (as defined in the Bidding Procedures Order) to the Sellers pursuant to the Bid Procedures Order; and

WHEREAS, on May 17, 2010, the Sellers conducted an auction (the "Auction") of the Sellers' physical assets in accordance with Section 363 of the Bankruptcy Code and the Bidding Procedures;

WHEREAS, the Sellers determined that the Buyer had the highest or otherwise best offer at the Auction for the sale of the Acquired Assets (as defined below);

WHEREAS, upon the terms and subject to the conditions set forth herein and pursuant to Sections 363 and 365 of the Bankruptcy Code, the Sellers desire to sell, transfer, convey, assign and deliver to Buyer, and Buyer desires to purchase and accept from the Sellers, the Acquired Assets as contemplated herein; and

WHEREAS, the parties desire to consummate the Proposed Transactions (as defined below) as promptly as practicable after the Bankruptcy Court enters an order approving the Proposed Transactions;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1.    Defined Terms.  As used herein, the following terms have the meanings set forth below:

"Acquired Assets" means the Vessel, the Related Equipment, the Other Equipment and the ROVs.

"Agreement" has the meaning set forth in the Preamble.

"Auction" has the meaning set forth in the Recitals.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures" has the meaning set forth in the Recitals.

"Bid Procedures Order" has the meaning set forth in the Recitals.

"Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banks in Houston, Texas are generally authorized or obligated, by Law or executive Order, to close.

"Buyer" has the meaning set forth in the Preamble.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Deposit" has the meaning set forth in Section 2.4.

"DM3" has the meaning set forth in the Preamble.

"*DMT Diamond*" means the *DMT Diamond*, U.S. Coast Guard Official Number 1091373.

"DMT Diamond ROV" means one Triton™ XLS (XLS 5) heavy work class remote operated vehicle currently located at Technology's offices in Houston, Texas, and previously dedicated to the *DMT Diamond* (excluding the launch and recovery system for such remote operated vehicle currently onboard on the *DMT Diamond*).

"*DMT Sapphire*" means the *DMT Sapphire*, U.S. Coast Guard Official Number 1129810.

"DMT Sapphire ROV" means one Triton™ XLS (XLS 36) heavy work class remote operated vehicle currently installed on the *DMT Sapphire*.

-2-

"*DMT Topaz*" means the *DMT Topaz*, U.S. Coast Guard Official Number 1071956.

"DMT Topaz ROV" means one Triton™ XLS (XLS 6) heavy work class remote operated vehicle currently installed on the *DMT Topaz*.

"Encumbrances" means any charters, mortgages, liens (maritime or otherwise), security interests, claims, pledges, assignments, charges, options, rights of tenants or others, rights of first refusal or other title retention agreements, easements, defects in title, covenants, conditions or other restrictions of any nature whatsoever.

"Governmental Authority" means any United States, foreign, international, supranational, national, provincial, regional, federal, state, municipal or local government, any instrumentality, subdivision, court, administrative or regulatory agency or commission or other authority thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"Law" means any federal, state or local statute, law (including common law), code, ordinance, rule, administrative interpretation, regulation, requirement, judgment, decree or order.

"Nemesis ROV" means one work class remote operated vehicle currently located at Technology's offices in Houston, Texas.

"Order" means any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"Other Equipment" means those items identified on Exhibit A-1.

"Periodic Taxes" has the meaning set forth in Section 3.5(b).

"Person" means any natural person, firm, partnership, joint venture, limited liability company, association, corporation, trust, business trust, unincorporated organization, Governmental Authority or other entity.

"Proposed Transactions" means all of the transactions between the Buyer and the Sellers contemplated hereby, including the transfer, sale, conveyance, assignment and delivery by the Sellers to Buyer, and the acquisition by Buyer from the Sellers, of the Acquired Assets, free from all Encumbrances, as contemplated herein and the performance by the parties of their respective covenants and obligations hereunder.

"Proration Periods" has the meaning set forth in Section 3.5(b).

"Purchase Price" means the sum of the purchase prices to be paid for the Acquired Assets pursuant to Sections 2.2(a), (b) and (c).

"Related Equipment" means, with respect to the Vessel or the ROVs, any and all equipment, machinery, engines, tower, cranes, spare parts, spare equipment and stores,

manuals, logs, software, licenses, records, radio installation and equipment, navigational equipment, electronics, in used or unused condition, and other appurtenances thereto, including, without limitation, those items identified on Exhibit A-2.  With respect to the DMT Topaz ROV and the DMT Sapphire ROV, the term "Related Equipment" includes the related launch and recovery systems ("LARS") currently onboard the *DMT Topaz* and *DMT Sapphire*, respectively, and with respect to the DMT Diamond ROV the term "Related Equipment" does not include a LARS currently onboard the *DMT Diamond*.  Notwithstanding anything to the contrary contained herein, the term "Related Equipment" shall not include any software, licenses or other intellectual property that cannot be assigned without consent or without cost to the Sellers.

"Representative" means, with respect to any Person, such Person's officers, directors, employees, agents and representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person).

"ROVs" means the DMT Diamond ROV, the DMT Sapphire ROV, the DMT Topaz ROV, and the Nemesis ROV, together with any and all control umbilicals, winches, control vans, cameras, manipulator arms and effectors, software, software licenses, and other related equipment, spare parts, spare equipment and stores related thereto, wherever located, whether on any vessel of any Debtor in the Bankruptcy, in Seller's warehouse at Imperial Valley Drive, Houston, Texas, or elsewhere.  Notwithstanding anything to the contrary contained herein, the term "ROVs" shall not include any software, licenses or other intellectual property that cannot be assigned without consent or without cost to the Sellers.

"Sale Approval Order" has the meaning set forth in Section 2.1.

"Sellers" has the meaning set forth in the Preamble.

"Tax" or "Taxes" means any federal, commonwealth, state, county, provincial, local or foreign income, gross receipts, sales, use, ad valorem, employment, severance, transfer, gains, profits, excise, franchise, personal and real property, capital stock, premium, minimum and alternative minimum or other taxes, fees, levies, licenses, duties, assessments or charges of any kind or nature whatsoever imposed by any Governmental Authority (whether payable directly or by withholding and including any tax liability incurred or borne as a transferee or successor or by contract, or otherwise), together with any interest, surcharges, penalty (civil or criminal), or additional amounts imposed by, any Governmental Authority with respect thereto.

"Technology" has the meaning set forth in the Preamble.

"Transaction Taxes" has the meaning set forth in Section 3.5(a).

"Vessel" means the *DMT Topaz*.

Section 1.2.    Construction.  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, and words used in the singular shall include the plural, and vice versa.  Unless the context otherwise requires, (a) all references to Articles and Sections refer to the applicable articles and sections of this Agreement,

-4-

(b) all references to Exhibits and Schedules refer to the applicable exhibits and schedules attached hereto, each of which is incorporated herein for all purposes, (c) the terms "include" and "including" mean include or including without limitation, (d) a reference to an agreement or instrument is to the agreement or instrument as amended or modified through the date as of which the reference is made and (e) a reference to a party or the parties refers to a party or the parties to this Agreement. In the event of a conflict between the terms and provisions contained in the main body of this Agreement and any of the terms or provisions contained in the Exhibits or Schedules attached hereto, the terms and provisions in the main body of this Agreement shall control. All amounts appearing in this Agreement are in U.S. dollars.

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS; CONDITIONS; DEPOSIT

Section 2.1.    Bankruptcy Court Approval. The respective obligations of each party to effect the transactions contemplated in this Agreement are subject to the Bankruptcy Court entering an order (in form and substance reasonably satisfactory to Buyer) (the "Sale Approval Order") finding that (i) notice of the hearing concerning approval of the transactions contemplated hereunder was given to all holders of claims, liens and interests in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and constitutes such notice as is appropriate under the particular circumstance under the Bankruptcy Code and in accordance with any other applicable Law, and (ii) the Sellers have the legal right and capacity to convey all the respective right, title and interest of the Sellers in and to the Acquired Assets and that Buyer is a good faith buyer entitled to the protections afforded by Bankruptcy Code Section 363(m) providing for the sale of the Acquired Assets free and clear of all Encumbrances, with such Encumbrances to attach to the consideration to be received by the Sellers in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, or satisfied in full at Closing.

Section 2.2.    Acquired Assets. Subject to the approval of the Bankruptcy Court and upon the terms and subject to the conditions set forth in this Agreement, at the Closing:

(a)    DM3 shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase and accept from DM3, all of DM3's rights, title and interests in and to the *DMT Topaz*, and DM3 and Technology shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase and accept from DM3 and Technology, all of DM3's and Technology's rights, title and interests in and to the Related Equipment for the *DMT Topaz*, in each case free and clear of any Encumbrances, for an aggregate purchase price of $6,200,000.00;

(b)    Technology shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase and accept from Technology, all of Technology's rights, title and interests in and to the ROVs, free and clear of any Encumbrances, for an aggregate purchase price of $6,400,000.00;

(c)    Technology shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase and accept from Technology, all of Technology's

rights, title and interests in and to the Other Equipment, for an aggregate price of $350,000.00; and

(d)      Technology shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchaser and accept from Technology, all of Technology's rights, title and interests in and to the bunkers and unbroached lube onboard the Vessel on the Closing Date at the current net market price for same on the Closing Date. The quantities and net market price of bunkers and unbroached lube on the Vessel shall be agreed upon on the Closing Date, and the market price shall be paid to Seller by Buyer within five (5) Business Days of the Closing Date.

Section 2.3.   Closing Conditions.

(a)      Buyer shall have no obligation under this Agreement to purchase less than all of the Acquired Assets.

(b)      The foregoing notwithstanding, the Buyer's obligation to purchase the Acquired Assets under this Agreement is subject to the fulfillment or waiver, on or prior to the Closing Date, of each of the following conditions:

(i)      the Sellers delivering to Buyer title to the Vessel, its Related Equipment, the ROVs and the Other Equipment at the Closing;

(ii)      the Vessel and ROVs being in the same condition at the Closing as they were in on the date hereof, ordinary wear and tear excepted; and

(iii)      all of the Sellers' representations and warranties in Article 4 hereof being true and correct in all material respects at the Closing.

Section 2.4.   Deposit.

(a)      As security for the proper fulfillment of this Agreement, Buyer has paid a deposit of $1,295,000 (the "Deposit") to the Sellers. The Deposit is held in escrow subject to the terms and conditions of the Escrow Agreement, dated as of May 12, 2010, by and among the Sellers, the Buyer and Amegy Bank National Association. Any fee charged for holding the Deposit will be borne by Buyer.

(b)      At the Closing, the Deposit shall be credited against the Purchase Price and retained by the Sellers as a component of the Purchase Price.

(c)      If this Agreement is terminated for any reason other than by the Sellers pursuant to Section 9.2, the Deposit shall be returned to Buyer (without interest) within three (3) Business Days following such termination by wire transfer of immediately available funds to an account designated by Buyer.

(d)      If this Agreement is terminated by the Sellers pursuant to Section 9.2, the Sellers shall be entitled to retain the Deposit, provided that such

-6-

amount shall constitute liquidated damages and retention by the Sellers shall be the sole remedy available to the Sellers under this Agreement or applicable Law.

## ARTICLE 3
## THE CLOSING

Section 3.1.    Closing.    The closing of the purchase and sale of the Acquired Assets pursuant to Article 2 hereof (the "Closing") shall take place at the offices of Bracewell & Giuliani LLP, 711 Louisiana Street, Houston, Texas 77002, at 9:30 a.m., Central Time, on the first Business Day after fifteen (15) calendar days following the date of the Sale Approval Order (or such other date as is mutually agreed by the Sellers and Buyer) (such date, the "Closing Date").

Section 3.2.    Deliveries Prior to the Closing.    Prior to the Closing, the Sellers shall deliver to Buyer a certified copy of the Sale Approval Order.

Section 3.3.    Deliveries at Closing.    At the Closing, subject to the terms and conditions hereof:

(a)    the Sellers shall deliver to Buyer, in form and substance reasonably satisfactory to Buyer, a Bill of Sale for the Vessel in a form recordable in the United States Coast Guard's National Vessel Documentation Center;

(b)    Buyer and the Sellers shall sign and deliver to each other a Protocol of Delivery and Acceptance with respect to the Vessel confirming the date and time of delivery of such Vessel from the Sellers to Buyer;

(c)    the Sellers shall deliver to Buyer such other assignments, instruments, filings and documents as may be reasonably necessary or required to carry out the sale to Buyer of the Acquired Assets, including, without limitation, the items set forth on Exhibit "B"; and

(d)    Buyer shall pay the Sellers the Purchase Price by wire transfer on the Closing Date of immediately available funds to the bank account or accounts of the Sellers designated by Sellers in writing no later than the second Business Day immediately preceding the Closing Date.

Section 3.4.    Delivery of Vessel, ROVs, Other Equipment and Documentation.

(a)    The Vessel is currently located at the Bender Shipyard in Mobile, Alabama.  However, the Vessel and any Related Equipment situated on the Vessel, the DMT Sapphire ROV, and the DMT Topaz ROV shall be delivered to Buyer on the Closing Date at the Conrad Shipyard in Morgan City, Louisiana (or such other location as is mutually agreed upon among the Buyer and the Sellers).  The remaining Related Equipment, the DMT Diamond ROV, the Nemesis ROV, and the Other Equipment shall be delivered to the Buyer on the Closing Date in their current locations (or such other location as is mutually agreed upon among the Buyer and the Sellers).

-7-

(b)      The Sellers shall, prior to the Closing Date and at their own cost and expense, remove the (i) DMT Sapphire ROV (and its LARS) from the *DMT Sapphire* and (ii) the DMT Topaz ROV (and its LARS) from the *DMT Topaz*.  The Buyer acknowledges and agrees that it is not purchasing the LARS currently onboard the *DMT Diamond* (which was previously used for the DMT Diamond ROV).

(c)      Prior to the Closing, the Sellers shall, upon reasonable advance notice to the Sellers, afford the Buyer such access during normal business hours to the *DMT Topaz*, the ROVs and the Other Equipment as the Buyer may reasonably request for the purpose of inspection and inventory of such Acquired Assets.  All requests for access made pursuant to this Section 3.4(c) shall be directed to the Sellers' Chief Restructuring Officer or a person designated by him in writing to the Buyer.

(d)      At the Closing, the Sellers shall provide to Buyer all drawings, licenses, manuals, and classification, registry, survey, certification and other technical documentation concerning the Vessel and ROVs on board the Vessel or in the Sellers' possession.  The Sellers shall have the right to retain copies at their cost of all such drawings, classification, registry and other technical documentation.

(e)      Subject to the provisions of Section 2.3, until delivery to Buyer at the Closing, all risk of loss of and/or damage to the Acquired Assets shall remain with the Sellers and all of the Acquired Assets shall be delivered in the same condition as they were in on the date this Agreement was executed, ordinary wear and tear excepted.  Without limiting any other provision hereof, in the event that the Vessel, its Related Equipment, any of the ROVs, or the Other Equipment is destroyed or materially damaged, Buyer may, at its option, elect to terminate this Agreement without further obligation by providing written notice of such termination to the Sellers within five (5) Business Days of receiving notice of such destruction or material damage.

Section 3.5.    Taxes.

(a)      Transaction Taxes.  Any Taxes that may be payable by reason of the sale of the Acquired Assets under this Agreement in the Proposed Transactions (including any transfer, sales, use, value added, gross receipts, stamp, duty, documentary, registration, business and occupation and similar Taxes) ("Transaction Taxes") shall be the responsibility and obligation of the Buyer regardless of whether any Tax authority seeks to collect such Taxes from the Sellers or Buyer.  In no event shall either party to this Agreement be responsible for the Taxes based on net income, margin or gain of the other party that arises as a consequence of the consummation of the Proposed Transactions.

(b)      Tax Prorations.  As to any Acquired Assets acquired by Buyer, the Sellers and Buyer shall apportion the liability for real and personal property taxes and ad valorem taxes ("Periodic Taxes") for all Tax periods including but not beginning or ending on the Closing Date (the "Proration Periods").  The Periodic Taxes described in this Section 3.5(b) shall be apportioned between the Sellers and Buyer as

-8-

of the Closing Date, with Buyer liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the numerator of which is the number of days remaining in the Proration Period from and after the Closing Date (including the Closing Date), and the denominator of which is the total number of days covered by such Proration Period.  The Sellers shall be liable for that portion of the Periodic Taxes for the Proration Period for which Buyer is not liable under the preceding sentence.  At the Closing, Buyer shall receive a credit against the Purchase Price of the Sellers' portion of the Periodic Taxes that are due and payable during the relevant Proration Period on or after the Closing Date and, if applicable, Buyer shall be charged with Buyer's portion of such Periodic Taxes that are due and payable (and have been paid) before the Closing Date.  If the Closing Date shall occur before the tax rate is fixed, the apportionment of ad valorem taxes shall be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation.  If, after the Closing Date, Periodic Taxes for the Proration Periods are determined to be higher or lower than those that have been apportioned as set forth above, Buyer shall, as applicable, within 30 days of receiving the relevant tax bill, either pay the amount Buyer owes the Sellers or provide an invoice to the Sellers of the amount the Sellers owe Buyer, which amount the Sellers promptly shall thereafter pay to Buyer as an administrative expense in the Bankruptcy Case.  For purposes of this Section 3.5(b), the Proration Period for ad valorem taxes and real and personal property taxes shall be the fiscal period for which such taxes were assessed by the relevant tax jurisdiction.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers hereby represent and warrant to Buyer as follows:

Section 4.1.    Organization; Good Standing; Qualification.  Each of the Sellers is a corporation or limited liability company duly incorporated or formed, validly existing and in good standing under the Laws of its state of organization and has the requisite corporate or limited liability company power and authority to own or lease and to operate all of its properties and assets and to carry on its business as it is now being conducted.

Section 4.2.    Authority of the Sellers; Binding Effect.

(a)     Subject only to Bankruptcy Court approval pursuant to the Sale Approval Order, the Sellers have the requisite power and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by the Sellers pursuant hereto and to perform its obligations hereunder and thereunder.  Subject only to Bankruptcy Court approval pursuant to the Sale Approval Order, the execution and delivery by the Sellers of this Agreement and the other documents and instruments to be executed and delivered by the Sellers pursuant hereto and the performance of the Sellers' obligations hereunder and thereunder, including the consummation of the transactions contemplated by this Agreement, have been duly authorized by all necessary corporate or other action on the part of the Sellers.

(b)      Subject only to Bankruptcy Court approval pursuant to the Sale Approval Order, this Agreement has been duly executed and delivered by the Sellers, and assuming the due authorization, execution and delivery hereof by Buyer, constitutes, and when executed and delivered each of the other documents and instruments to be executed and delivered by the Sellers pursuant hereto will constitute, a valid and binding agreement of the Sellers enforceable against the Sellers in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws of general application to creditors, (ii) general principles of equity and (iii) the power of a court to deny enforcement of remedies generally based on public policy.

Section 4.3.    Third-Party Software, Licenses and Intellectual Property.    To the knowledge of Seller, no third-party software, licenses or other intellectual property exists which has been used in the operation of the Vessel or ROVs and which is not part of the Acquired Assets.

Section 4.4.    Ownership of Vessel and ROV.    DM3 owns the Vessel, Technology owns the ROVs, and DM3 or Technology owns the Related Equipment and the Other Equipment, and, when transferred by the Sellers to the Buyer at the Closing, each will be free and clear of Encumbrances.

Section 4.5.    Consents and Approvals.    Except for the Bankruptcy Court approval pursuant to the Sale Approval Order, no consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority or other Person is required for or in connection with the execution and delivery of this Agreement by the Sellers or for or in connection with the consummation of the Proposed Transactions and performance of the terms and conditions contemplated hereby by the Sellers.

Section 4.6.    Brokers.    No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Sellers for which Buyer will incur any liability.

Section 4.7.    Coastwise Qualification.    The Sellers are citizens of the United States under 46 U.S.C. § 50501, qualified to own and operate the Vessel in the coastwise trade of the United States. The Vessel is qualified under 46 U.S.C. § 12112 to engage in the coastwise trade of the United States.

**ARTICLE 5**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to the Sellers as follows:

Section 5.1.    Organization; Good Standing; Qualification.    Buyer is a corporation or limited liability company duly incorporated or formed, validly existing and in good standing under the Laws of its state of organization and has the requisite corporate or limited liability company power and authority to own or lease and to operate all of its properties and assets and to carry on its business as it is now being conducted and as presently proposed to be conducted.

-10-

Section 5.2.    Authority of Buyer; Binding Effect.

(a)    Buyer has the requisite power and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and to perform its obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and the performance of its obligations hereunder and thereunder, including the consummation of the transactions contemplated by this Agreement, have been duly authorized by all necessary corporate or limited liability company or other action on the part of Buyer.

(b)    This Agreement has been duly and validly executed and delivered by Buyer and constitutes, and each of the other documents and instruments to be executed by Buyer pursuant hereto upon Buyer's execution and delivery will constitute, a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws of general application to creditors, (ii) general principles of equity and (iii) the power of a court to deny enforcement of remedies generally based on public policy.

Section 5.3.    Consents and Approvals.  No consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authority or other Person is required for or in connection with the execution and delivery of this Agreement by Buyer or for or in connection with the consummation of the transactions and performance of the terms and conditions contemplated hereby by Buyer.

Section 5.4.    Financing.  Buyer has available, and as of the Closing Date will have available, sufficient cash, available lines of credit or other sources of immediately available funds to enable it to pay the Purchase Price and pay any other amounts to be paid by it under this Agreement.  Buyer's obligations hereunder are not subject to any condition regarding Buyer's ability to obtain financing for the consummation of the transactions contemplated hereunder.

Section 5.5.    Brokers.  No Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer for which the Sellers will incur any liability.

## ARTICLE 6
## [INTENTIONALLY DELETED]

## ARTICLE 7
## [INTENTIONALLY DELETED]

## ARTICLE 8
## SURVIVAL OF REPRESENTATIONS
## AND WARRANTIES; DISCLAIMER

Section 8.1.    <u>Survival of Representations and Warranties</u>.   The representations and warranties of the parties hereto contained herein shall not survive the Closing; <u>provided, however</u>, after the Closing, Seller agrees to execute and deliver such other documents as may be necessary or appropriate to effect the delivery of title and/or physical possession of the Acquired Assets.   The covenants, acknowledgments and agreements contained herein shall survive the Closing and shall remain in full force and effect until fully performed.

Section 8.2.   **Disclaimer.**   **Except as specifically set forth in this Agreement, Buyer:**

(a)    **acknowledges and agrees that it has inspected the Vessel and its classification records, deck and engine logs and other records, the ROVs and the other Acquired Assets prior to entering into this Agreement;**

(b)    **acknowledges and agrees that the Sellers have not made, do not make and expressly disclaim any warranties, representations, covenants or guarantees, either express or implied, whether arising by operation of law or otherwise, as to the merchantability, quantity, quality or physical condition of the Acquired Assets or their suitability or fitness for any particular purpose or use;**

(c)    **hereby accepts the Acquired Assets in their present physical condition on an "AS IS," "WHERE IS" and "WITH ALL FAULTS AND DEFECTS" basis, regardless of how such faults and defects were caused or created (by the Sellers' negligence, actions, omissions, fault or otherwise), and acknowledges that (i) without this acceptance, this sale would not be made and (ii) the Sellers shall not be under any obligation whatsoever to undertake any improvement, repair, modification, alteration, remediation or other work of any kind with respect to any of the Acquired Assets;**

(d)    **individually, and on behalf of its successors and assigns, hereby expressly releases the Sellers from any and all responsibilities, liabilities, obligations and claims, known and unknown, whether based upon negligence, strict liability or otherwise, arising under any Law, including any obligations to take the Acquired Assets back or reduce the Purchase Price, or any actions for contribution or indemnity, or to improve, repair or otherwise modify the physical condition or operation of the Acquired Assets, that Buyer or its successors or assigns may have against the Sellers or that may arise in the future from the physical condition of the Acquired Assets, regardless of how caused or created (by the Sellers' negligence, actions, omissions or fault, pursuant to any statutory scheme of strict liability, or otherwise); Buyer acknowledges that the provisions of this Section 8.2 have been fully explained to Buyer and that it fully understands and accepts the same as a condition to proceeding with this transaction; Buyer further acknowledges that none of the Sellers' employees, agents or**

-12-

Representatives has made any statements or representations contrary to the provisions of this Section 8.2;

(e)   except as specifically stated in this Agreement, acknowledges that the Sellers make no warranty or representation, express, implied statutory or otherwise, as to the accuracy or completeness of any data, reports, records, projections, information or materials now, heretofore or hereafter furnished or made available to Buyer in connection with the Acquired Assets, including any description of the Acquired Assets, the pricing assumptions, the physical condition of the Acquired Assets, any other matters contained in the data or any other materials furnished or made available to Buyer by the Sellers or by the Sellers' employees, agents or Representatives; and

(f)   by virtue of the purchase of the Acquired Assets from the Sellers, acknowledges that the Sellers hereby expressly excludes, and does not assign, transfer or convey to Buyer, any rights or benefits of or to any insurance policies of the Sellers which might relate to, cover or insure the Sellers for loss of or liability arising from the use, ownership or operation of the Acquired Assets, regardless of whether such assignment, right or benefit arises by statute, agreement or operation of law, including but not limited to defense and indemnity benefits attributable to or arising from or under such policies.

## ARTICLE 9
## TERMINATION

Section 9.1.   Termination by Buyer.  Buyer may terminate this Agreement:

(a)   if the Sale Approval Order is not entered on or before June 30, 2010 and as otherwise set forth herein; or

(b)   as provided in Section 3.4(e).

Section 9.2.   Termination by the Sellers.  The Sellers may terminate this Agreement if:

(a)   the Deposit is not paid in accordance with Section 2.4; or

(b)   the Purchase Price is not paid in accordance with Section 3.3.

## ARTICLE 10
## MISCELLANEOUS

Section 10.1.  Waiver of Consequential Damages.   NOTWITHSTANDING ANYTHING CONTAINED TO THE CONTRARY IN THIS AGREEMENT, THE SELLERS AND BUYER AGREE THAT THE RECOVERY BY EITHER PARTY HERETO OF ANY DAMAGES SUFFERED OR INCURRED BY IT AS A RESULT OF ANY BREACH BY THE OTHER PARTY OF ANY OF ITS REPRESENTATIONS, WARRANTIES OR OBLIGATIONS UNDER THIS AGREEMENT SHALL BE LIMITED TO THE ACTUAL

-13-

DAMAGES SUFFERED OR INCURRED BY THE NON-BREACHING PARTY AS A RESULT OF THE BREACH BY THE BREACHING PARTY OF ITS REPRESENTATIONS, WARRANTIES, OR OBLIGATIONS HEREUNDER AND IN NO EVENT SHALL THE BREACHING PARTY BE LIABLE TO THE NON-BREACHING PARTY FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES (INCLUDING ANY DAMAGES ON ACCOUNT OF LOST PROFITS OR OPPORTUNITIES OR LOST OR DELAYED PRODUCTION) SUFFERED OR INCURRED BY THE NON-BREACHING PARTY AS A RESULT OF THE BREACH BY THE BREACHING PARTY OF ANY OF ITS REPRESENTATIONS, WARRANTIES, OR OBLIGATIONS HEREUNDER.

Section 10.2.  <u>Waiver of Right to Trial by Jury</u>.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.2.

Section 10.3.  <u>Notices</u>.  Unless otherwise provided in this Agreement, any notice, tender, or delivery to be given under this Agreement by any party to the other may be effected (a) by personal delivery in writing, (b) by registered or certified mail, postage prepaid, return receipt requested, or (c) by reputable overnight commercial carrier guaranteeing overnight delivery, and shall be deemed communicated upon actual receipt.  Mailed notices shall be addressed as set forth below, but each party may change the address and/or recipient to which notices are to be sent to such party by written notice in accordance with this paragraph.

(a)      If to the Sellers, addressed to:

Deep Marine Holdings, Inc.
20411 Imperial Valley Drive
Houston, Texas  77073
Attention: John Bittner, Chief Restructuring Officer
Email:  john.bittner@gt.com

with a copy (which shall not constitute notice) to:

Bracewell & Giuliani LLP

South Tower, Pennzoil Place
711 Louisiana, Suite 2300
Houston, Texas  77002-2770
Attention:  William A. (Trey) Wood, III
Email:  trey.wood@bgllp.com

(b)      If to Buyer, addressed to:

EZRAM, LLC
Dale Alberda
1916 Pike Place # 12
Seattle, WA 98101
Email:  dale.alberda@emasoffshore.com

with a copy (which shall not constitute notice) to:

Ezra Holdings Limited
15 Hoe Chiang Road
# 15-01 Tower Fifteen
Singapore 089316
Email: jason.goh@ezraholdings.com
Additional Email:  chinkwang@ezraholdings.com

with a copy (which shall not constitute notice) to:

Locke Lord Bissell & Liddell, LLP
600 Travis St., Suite 2800
Houston, TX 77002
Attn: Mr. Philip K. Lau
Email: plau@lockelord.com

Section 10.4.   <u>Amendment; Waiver</u>.  This Agreement may be amended, supplemented or modified only by a written instrument executed by the Buyer and the Sellers, or in the case of a waiver, by the party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision of this Agreement (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

Section 10.5.   <u>Closing Date</u>.  All actions to be taken on the Closing Date pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

Section 10.6.   <u>Severability</u>.  Should any term, provision or paragraph of this Agreement be, for any reason, determined to be invalid, illegal or unenforceable in any respect, said provision shall survive to the extent it is not so determined, and all of the other provisions of this

-15-

Agreement shall remain in full force and effect only if, after excluding the portion deemed to be illegal, invalid or unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of (a) the date hereof and (b) the date this Agreement was last amended.

Section 10.7.   Headings.   The table of contents and the headings contained in this Agreement are for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

Section 10.8.   Payment of Fees and Expenses.   Except as otherwise provided in this Agreement, and whether or not the transactions contemplated by this Agreement are consummated, Buyer, on the one hand, and the Sellers, on the other hand, shall be responsible for, and shall pay, all of their respective fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transactions contemplated hereby.

Section 10.9.   Assignments.   Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned by Buyer without the prior written consent of the Sellers, and any purported assignment in violation of this Section 10.9 shall be null and void.

Section 10.10.   Binding Effect; No Third-Party Beneficiary.   This Agreement shall bind and inure to the benefit of the parties and their respective successors and permitted assigns. This Agreement shall be binding upon and inure solely to the benefit of the Sellers, Buyer and their respective successors and permitted assigns, and, except as provided in this Section 10.10, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

Section 10.11.   Governing Law.   This Agreement shall be governed by and construed in accordance with general maritime laws of the United States and, subject thereto, the internal laws of the State of Texas, without regard to any rules of conflict of laws which would cause the laws of another jurisdiction to apply.

Section 10.12.   Construction.   In the interpretation and construction of this Agreement, the parties acknowledge that the terms of this Agreement reflect extensive negotiations between the parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, to have been drafted by either party hereto.

Section 10.13.   Counterparts.   This Agreement may be signed in two or more counterparts, each of which shall be deemed an original.   The parties further agree that counterparts to Agreement may be delivered by facsimile.

Section 10.14.   Jurisdiction and Consent to Service.

      (a)   Without limiting any party's right to appeal any Order of the Bankruptcy Court, the parties agree that the Bankruptcy Court will have exclusive jurisdiction over any disputes arising under this Agreement.

NO:0025333/00001:141261v1

(b)      If the Bankruptcy Court does not have jurisdiction over a dispute that arises under this Agreement, or for whatever reason fails or refuses to take jurisdiction over any other dispute arising hereunder, then, except as otherwise expressly set forth in this Agreement, the Sellers and Buyer each (1) agree that any suit, action or proceeding arising out of or relating to this Agreement shall be brought solely in state or federal court of competent jurisdiction located in Harris County, Texas; (2) consents to the exclusive jurisdiction of each such court in any suit, action or proceeding relating to or arising out of this Agreement; (3) waives any objection that it may have to the laying of venue in any such suit, action or proceeding in any such court; and (4) agrees that service of any court paper may be made in such manner as may be provided under applicable laws or court rules governing service of process.

Section 10.15. <u>Attorneys' Fees</u>.  If any party hereto brings any action or suit against another party hereto by reason of any breach of any of the agreements or provisions of this Agreement, then, in such event, the prevailing party, as determined in such action or suit, shall be entitled to have and recover from the other party or parties all costs and expenses of such action or suit, including reasonable attorneys' fees and expenses resulting therefrom; it being understood and agreed that the determination of the prevailing party shall be included in the matters which are the subject of such action or suit.

* * * * *

-17-

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

**DEEP MARINE TECHNOLOGY INCORPORATED**

By: _____
    Name:  John D. Bittner
    Title:   Chief Restructuring Officer

**DEEP MARINE 3, LLC**

By: _____
    Name:  John D. Bittner
    Title:   Chief Restructuring Officer

**EZRAM LLC**

By: _____
    Name: Dale Alberda
    Title:   Manager

SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT

Error! Unknown document property name.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

**DEEP MARINE TECHNOLOGY INCORPORATED**

By: _____
      Name:  John D. Bittner
      Title:   Chief Restructuring Officer

**DEEP MARINE 3, LLC**

By: _____
      Name:  John D. Bittner
      Title:   Chief Restructuring Officer

**EZRAM LLC**

By: _____
    Name: Dale Alberda
    Title:  Manager

SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT

EXHIBIT A-1

## Other Equipment

| Description | Quantity | Location |
|---|---|---|
| **Dynacon Equipment/Base Spares** | | |
| Dynacon Winch Pump & Motor (Spare for XLS-37 and XLS-54) | 2 | Shop |
| Dynacon Umbilical Drum Shipping Cradle SN: 984102SC | 1 | Yard |
| Dynacon Umbilical Drum (Full Umbilical Drum and Umbilical attached to Shipping Cradle SN 984102SC) | 1 | Yard |
| Dynacon Charge Cart Motor | 1 | Shop |
| Dynacon Main Electric Winch Motor | 1 | Shop |
| | | |
| **Umbilicals and Tethers** | | |
| Nexan ROV Umbilical, on winch drum, used umbilical from XLS-6 | 1 | Yard |
| XLS Umbilicals (damaged) | 2 | Yard |
| Nexan 35mm Tether, PRC-A67804-001, Qty. 645 meters | 2 | Shop |
| XLS Deck Cable (partial reel) (approx. 150ft.) | 1 | Shop |
| | | |
| **ROV Tools** | | |
| ROV Hot Stabs (Male) | 15 | Shop |
| ROV Hot Stabs (Female) | 18 | Shop |
| Perry Class 4 Torque Tool Unit | 2 | Shop |
| Perry Class 4 Torque Tool Verification Unit | 1 | Shop |
| Torque Tool Counter | 2 | Store Room |
| Subsea Torque Verification Unit | 1 | Shop |
| Ocean Works FLOT Assy. with 3 cases of accessories | 2 | Shop |
| DMT, XLS ROV Hydraulic Tool Skid, with tray, Aluminum | 2 | Shop |
| Schilling Titan-4 Manipulator – Slave Unit | 1 | Shop |
| ROV Friendly Hooks (60 Ton) | 2 | Shop |
| ROV Friendly Hooks (30 Ton) | 4 | Shop |
| 10K Intensifier Tool | 2 | Shop |

| | | |
|---|---|---|
| Hydraulic Grinder | 2 | Shop |
| Subsea Dredge | 3 | Shop |
| | | |
| **ROV Spares** | | |
| XLS Auxiliary Pump | 1 | Shop |
| XLS Winch Pump Motor | 1 | Shop |
| Perry HVTU, SN 20052990 | 1 | Store Room |
| Perry TMS HPU Transformer | 1 | Shop |
| Sun Star, Perry TMS, 25 HP Motor (Extended TMS) | 1 | Shop |
| Control Can, with populated tray (Spare for XLS-5 or XLS-6) | 1 | Shop |
| Bundle of Stainless Steel & Aluminum Plumbing Raw Materials (10'&12' Lengths) | 1 | Shop |
| Slingby TA0009 Arms | 2 | Shop |
| TMS Chain Guard | 1 | Shop |
| Innerspace Kort Nozzles | 9 | Shop |
| Foam Blocks | 1 | Shop |
| Hydraulic Rams | 2 | Shop |
| Hydraulic Motors (Spares) | 5 | Shop |
| Electric Winch Motor | 1 | Shop |
| Sun Star, Perry TMS, 10HP Motor | 1 | Shop |
| Kawasaki 100HP ROV Pump Assy. | 1 | Shop |
| XLS Hydraulic Thruster | 1 | Shop |
| Simrad Camera | 3 | Store Room |
| Insite Pacific Camera | 2 | Store Room |
| | | |
| **Main Spares / Supplies** | | |
| DMT Sapphire Spare Theatre seat | 1 | Shop |
| M/V DMT Diamond 50 Ton Crane Motor (Spare) | 1 | Shop |
| M/V DMT Diamond 50 Ton Crane Hose (Spare) | 1 | Shop |

| | | |
|---|---|---|
| M/V DMT Diamond 40 Ton Crane, 3 Piggy-Back Stack Pump Assy. (Spare) | 1 | Shop |
| Slings & Rigging (assorted) | 2 | Shop |
| Oil Water Separators | 2 | Shop |
| Drain Auger | 1 | Shop |
| Consumables for Sapphire (skids) | 6 | Shop |
| Shackles (skids) various sizes | 2 | Shop |
| Suit Containers | 4 | Shop |
| 600ft of 3" Rope (reel) | 1 | Shop |
| Oil Filters (skid of various) | 1 | Shop |
| Filters for Welch Generator (pallet) | 1 | Shop |
| Tugger Winch | 1 | Shop |
| Dri-Zorb (pallet) | 1 | Shop |
| Marine Lubricant (pallet) | 1 | Shop |
| North Pacific, Hydraulic Knuckle Boom Crane, 4400 SWL | 1 | Yard |
| Life Boats | 3 | Shop |
| Lot of Rope | 3 | Shop |
| KVH Satalight Track Phone (aluminum box, control box, and cabling) | 1 | Shop |
| | | |
| **Rigging and Wire Rope** | | |
| 1.5" Wire Rope, on shipping spool, New Wire 10,000 ft. | 1 | Yard |
| Rigging Sets (several) | 1 | Yard |
| | | |
| **Nemesis 50HP ROV System** | | |
| Nemesis 50HP ROV | 1 | Yard |
| Nemesis 25HP TMS | 1 | Yard |
| LARS, winch, HPU Package as a whole | 1 | Yard |
| Nemesis 20 Foot Control Van | 1 | Yard |
| Nemesis 20 Foot Work Van | 1 | Yard |
| Nemesis Spare Umbilical | 1 | Yard |
| Nexan Spare Tether, Nemesis | 1 | Yard |
| Nemesis TMS Slipring – 2 Optical Pass, Focal | 1 | Store |

| | | Room |
|---|---|---|
| Nemesis Winch Slipring – 3 Optical Pass, Focal | 1 | Store Room |
| Nexan Spare Tether, Nemesis | 1 | Yard |
| | | |

EXHIBIT A-2

**Related Equipment**

| DMT Topaz | |
|---|---|
| Crane | 40 Ton Dynamic Knuckle Boom |
| Engines | (2) EMD 16-645-E6 1950HP @ 900 RPM |
| Z-Drive Units | (2) Kamewa Aquamaster 2001 |
| Generators | (3) Detroit Diesel 12V-7IN 250KW @ 1800 RPM |
| Emergency Generator | (1) Detroit Diesel 4-7IN 75KW @ 1800 RPM |
| Bow Thruster Engine | (2) Detroit Deisel 16V-149NA |
| Bow Thruster (Tunnel) | (2) Kamewa Aquamaster TT1650/MBS-CP 918 HP |
| All Electrical, Radio and Navigational Equipment | |
| All Software, Licenses and Permissions related to the Vessel or the ROVs | |
| | |

## EXHIBIT B

**Items to Be Delivered By Sellers At Closing**
(to the extent such item is on board the Vessel or in the Sellers' possession)

1.      Electronic copies of all marine records, compliance certificates and technical comments on each Vessel purchased by Buyer hereunder, including access to ABS information and data.

2. Electronic copies of all ROV systems purchased by Buyer hereunder, including maintenance, documentation, repair logs.

3. Electronic copies of all engineering data for all ROV systems purchased by Buyer hereunder and related tooling.

4. Electronic copies of all ROV tooling, including systems documentation, maintenance, photos and similar documentations for each ROV tool purchased by Buyer hereunder.

5. Electronic copies of all documents related to Sellers' purchase of all Vessels, ROVs, and ROV tooling purchased by Buyer hereunder.

6. Electronic copies of all project data by Vessel.

7.  Including, but not limited to, all operating and maintenance procedures and logs, drawing packages, and inventory control systems related to the Vessel and the ROVs.